19-2702. Ms. Chambers. There's some background noise. Someone please mute their phone. Thank you. Ms. Chambers. Good morning, Your Honors. I'm Amy Chambers. I'm here on behalf of the Okay. And in this case, Mr. Grega, we're arguing that the administrative law judge did not properly address or explain probative evidence and opinions that contradicted his residual functional capacity findings. This left unsupported residual functional capacity findings and frustrates meaningful court review. The ALJ also selectively read the record or his evaluation of opinions was not well explained. And okay, I'll just continue. So administrative law judges can resolve conflicts, but they must do it with sufficient specificity to enable the reviewing court to determine whether or not the determination is supported by substantial evidence. In this case, the ALJ's residual functional capacity, it's not clear where he, and I'll just go for example, he found limitations with Mr. Grega interacting with the public and with coworkers, but there's nothing in the record that supports that. There's a number of treating veteran affairs, I call them opinions, but even if they were not considered opinions, it's still probative evidence that contradicts the ALJ findings. Wasn't there evidence in the record that he has trouble dealing with stress and he explained his arrest by not being able to contain his anxiety or his emotions around other people and that's what got him into trouble? I mean, wouldn't that be a basis for finding that he would need to have limited interactions with the public? Yeah, I mean, that's interactions with the public, but also all of the opinions or evidence in the record shows that he has difficulty with others and that would include the public or coworkers or supervisors. Right, so there was evidence in the record to explain the residual functional capacity, finding that he should have limited interactions with the public and with coworkers. But the residual functional capacity doesn't include anything with supervisors, any limitation with supervisors, and that's not well explained. And the administrative law judge didn't consider or he didn't explain various, and I'll call them opinions, or at the very least, it's probative evidence that he didn't discuss. So for example, one of his VA treating doctors, Dr. Bridges, found that he had markedly elevated anxiety, persistent distress, inhibited his ability to feel pleasure, he had social isolation and difficulty with others, and his persistent discomfort and anxiety make him prone to act out aggressively or appear irritable, which further inhibited his ability to form adaptive social relationships. There's nothing about that that says, well, he's okay with the public, but he's not okay, or he's not okay with the public, but he's okay with supervisors. Even the consultative examiner, which is a one-time exam, but the consultative examiner didn't parse out that he was mildly limited only with the public and not with coworkers and supervisors. This is, I would say, it's critical because in the vocational expert, when he testified, he testified that if there were limitations with supervisors or being unable to accept criticism from supervisors, then that may preclude competitive work. And my, you know, we're arguing that the VA- Did any of these opinions actually say that he would be unable to interact with supervisors? They say this, Dr. Bridges says, you know, he has social isolation and difficulty with others. So he didn't say specifically supervisors, but- Right, so if it's an opinion that the ALJ would be required to consider, it would have to opine on his functional capacity, right? So what you're saying is there was evidence in the record that he could have looked to to conclude that he wouldn't be able to interact with supervisors, but it's not that it was a legal error that he didn't look at that opinion, right? Well, first I'm saying, I would say that these are functional opinions, but even not, it's probative evidence that contradicts the ALJ's conclusions. But there's also other evidence that he is interacting with others, right? He goes to the gym and goes bowling and does these other things that are functional. So, I mean, is your position that there isn't any evidence in the record that would allow somebody to conclude that he could have some interactions with co-workers and supervisors, even if it's a limited one? Well, I would say with, I mean, the fact that he relates to bowling, I mean, I think his bowling is part of his therapeutic activities. He has, he's in, or from the record, he has like an intensive group therapy and PTS therapy and things like that. And he has difficulty coping mechanisms, I guess. So, I mean, there may be, you know, evidence that he can go bowling, but I don't know that that shows that he can sustain a competitive position. And he also has uncontrolled mood swings. And what he was explaining to the judge in his testimony was that I can't control when I'm going to have an angry outburst. And so, I would think that an angry outburst, he's not going to distinguish. Well, because I'm having a psychological episode right now, I'm not going to have an outburst at my boss. And so, I don't know where the ALJ is making that distinction, because I don't think the record makes that distinction. And then also, the ALJ's explanation of opinions is not very well explained. So, for example, the ALJ credits Nurse Hammett with a GAF finding of 50, which doesn't really say much about his functional capacity. But she also found that he lacked coping skills. He recorded that partial weight. And then, there's numerous other GFAs, such as 45 from his VA treating doctors that found he has clinically significant distress and impairment in social, occupational, and areas of functioning for at least six months, which to me does not, you know, I don't know how the ALJ was able to come up with that. It supported his RFC. The other thing is the most detailed opinion in the record is from therapist, Ms. Petrello. And the judge has a problem with the form of her opinion, not the substance of it. So, I mean, he says, okay, you know, what does he say about hers? It's just not well explained. And I think that- Well, so he explains that Ms. Petrello, she checks off a box that says he would preclude the performance from 11 to 20% of an eight-hour workday. And he says that it's not very probative because she's using the standard form that identifies a range, and he would find it entitled to greater weight if she elaborated more. I mean, is that not an explanation for why he only gave partial weight to that opinion? So, if he thinks that Petrello expressed her opinion in only a way that was limited in its usefulness because it's this standard form with categories, that explains to me at least why he's giving limited weight to the opinion. Well, I- Why wasn't he allowed to do that? I mean, okay. What I would say to that is, you know, he's concluding that everything she's saying corresponds to moderate limitations in the agency form. And then he makes this blanket statement that, you know, his own treatment history and activities do not support he would be off task or unable to perform many simple activities. But what about her finding about him being unable to deal with others appropriately? And that would include handling criticism from a supervisor. There's treatment of him in the record. And so, I read it as he just has a problem with the actual format because it's not parsed out as mild, moderate, severe. And I would say hers is more detailed than the agency forms that they use because mild isn't really defined. But besides that, you know, the surrounding evidence around the consultative examiner's opinion shows, you know, his treating provider found he had significant problems with social interactions with others. Again, nobody distinguishes the difference between supervisors versus public versus coworkers. And the therapist even says that he- she does flesh it out and says he has, you know, this percentage of time he would be having, you know, he can't handle criticism this amount of time. So, there's that. All right. Thank you very much. You've reserved two minutes for rebuttal. We'll hear from your adversary. Mr. Jewett. Can you hear me, Your Honor? Yes. Your Honor, may it please the court, I represent the Commissioner of Social Security. The ALJ's findings are supported by the ALJ's consideration of all of the evidence, including treatment records, the opinions of two consultative doctors, psychological expert, reviewing physician, and Mr. Griega's own statements about his ability. It is, therefore, supported by substantial evidence and should be affirmed. Mr. Griega has argued that the ALJ overlooked medical opinion evidence. First, what Griega claims to be opinions are not functional assessments about Griega's ability to do the demands of work, but largely are treatment notes, relaying self-reported symptoms, and physical examination findings. By regulation, medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of impairments, what the claimant can still do, and physical or mental restrictions. Conversely, this court has ruled on more than one occasion that clinical observations, even those by treatment sources, are not medical opinions requiring greater scrutiny under the Commissioner's rules on evaluating medical opinion evidence. So it's not required, but if there is this evidence in the record from the notes of the different doctors that he would have trouble taking criticism from supervisors, then shouldn't the ALJ have accounted for that in the residual functional capacity assessments? He doesn't. Your opposing counsel says he doesn't say anything about his ability to deal with supervisors. Well, Your Honor, I would first point you to Dr. Selessner's opinion at page 283 of the record. Dr. Selessner, who had access to the records from the VA, including the very evidence that Mr. Greger is pointing to, and having viewed that evidence, noted, specifically stated that Mr. Greger did not have a significant limitation in dealing with supervisors. That's page 283 of the record. Furthermore, I would point that the ALJ repeatedly cited to the very exhibits that Greger contends were overlooked, noting evidence both favorable and unfavorable to Mr. Greger's claim for benefit. In the Step 3 finding, the ALJ cites to Mr. Greger reporting estrangement from his family and concludes that that's consistent with a moderate difficulty in social interaction. In the RFC section, while discussing the mental impairments, the ALJ cites to the 82nd page of the same exhibit. It's a treatment record from Drs. Zioban and Lawson, and notes in the decision that, you know, about Greger's need for everything to be perfect. The ALJ also cites to the VA record about what medications he's on. Well, he cites to them, but he does put great weight on the agency's own consultative physician who only saw him once, and is putting only lightweight on, you know, Bridges and Petrillo, who say that he's much more limited. So, you know, haven't we said that it's a problem if the agency is relying heavily on a consultative physician who sees them only once, even if, especially in the context of mental impairments, we need to look at somebody over time? That's correct, Your Honor, but there are no opinions in the record from a treating acceptable medical source to which controlling weight could have been given. What that means is that the strictures of the treating physician rule and this court's holdings in Burgess or Estrella are inapplicable in this case. Nevertheless, the ALJ did explicitly weigh Ms. Petrillo's opinion and gave good reasons for affording it little weight. Well, what are those reasons? For instance, Your Honor, the form that Ms. Petrillo filled out is suggestive at most. It's a checkbox form with little narrative detail. This court has repeatedly held that such forms with little narrative detail are of little evidential value and entitled to only little weight. I'd also point out that social worker Petrillo saw Mr. Grega only on three occasions and was not even his primary therapist. Her opinion is also unsupported by her notes, which reflect normal findings like neat and clean attire, normal hygiene, goal-directed thoughts, fair insight, and judgment. As this court held in similar cases, Keenan and Smith, unsupported limitations on such checkbox forms that lack narrative explanation are entitled to little weight. I'd also point out that the form, I think what the ALJ was trying to say is that the form itself is confusing. I point you to page 1318 of the record, Your Honor. It assesses a less than 10% impairment in the ability to maintain regular attendance and be functional within customary tolerances during an eight-hour workday. I don't even know what that took a form that was authored by the agency and altered that document so that it was more suggestive of limitation. If any source, if a treating physician had limited him to, let's say, attention and concentration would be precluded 20% of the day. That would be all but worked perclusive. And on that form, that's the middle option. I think the ALJ is suggesting that the form itself is suggestive and also does not support its conclusions with any clinical findings and indeed is inconsistent with Social Work Petrillo's own examination findings. Still, the ALJ included in the RFC several limitations that are consistent with that where Ms. Petrillo noted limitations in working in coordination with others. The RFC includes no working around the general public and only occasional interaction with coworkers. Where Ms. Petrillo noted limitations in responding appropriately to changes, the RFC limits Grego to simple routine work. So, in ultimately determining the RFC, the ALJ did rely on the opinions of the consultative physician and of the reviewing physician. But there were no other opinions in the record from an acceptable medical source upon which the ALJ could have given any weight. Additionally- Well, ALJ is not prohibited from relying on sources that are not acceptable medical sources. No, that's correct. Just not required to specifically consider all of them. So, if there was a lot of evidence from healthcare practitioners who are not acceptable medical sources, it wouldn't be required, but it would be problematic if a lot of that evidence was consistent and substantial and the ALJ just didn't pay attention to it, wouldn't it be? Yes, Your Honor, of course. But an opinion from a social worker, no matter the length and durability of their treatment relationship, could never be given control. Furthermore, I'd like to just point the court lastly to this court's holding in Brault. This court held that an ALJ is not required to discuss every piece of evidence submitted and does not have to state on the record every reason justifying a decision. Further, the court held, quote, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered, end quote. Thus, just because the ALJ did not expressly mention every treatment source by name, list every clinical observation in the 1300-plus page record, does not mean that the ALJ overlooked that evidence. What's important for the purposes of the substantial evidence review standard is whether the ALJ's decision was sufficiently detailed to permit meaningful judicial review, and we argue that the ALJ's decision was. Thank you. Thank you very much. Ms. Chambers, you have two minutes for rebuttal. Okay. I would just say that, again, Mr. Greger, we're arguing that the ALJ's decision and his evaluation and explanation was not well explained. You know, factors can consider in evaluating opinions of the length, nature, and extent of a relationship. So, the issue is not, or the requirement is not that it needs to be well explained, but rather sufficiently explained for us to conduct adequate review. What's the insufficiency here? Well, and I'm saying it's insufficiently explained as, it's not sufficiently explained that, you know, some of the factors consider when you're evaluating opinions is evidence in support of the opinion, consistency with the record as a whole. Now, if you look at the treating record, the treating record indicates that Mr. Greger has psychological disturbance and what about the opposing counsel just said, which is, so Dr. Selessner opined that he was able to remember and execute instructions and complete simple tasks. So, wouldn't that be evidence that supports the conclusion that he could interact somewhat with supervisors? I think that Dr. Selessner or whoever, the written consultant, his opinion was in 2013. So, he wouldn't have considered Dr. Bridges finding- Well, Brownfield also said that he could follow instructions, right? He could understand directions and instructions. So, isn't that some evidence? I know that maybe you object to the way the ALJ weighed the evidence, but as long as there's something in the record that supports the ALJ's decision, we're bound by it, right? So, why was the ALJ not allowed to credit the evidence from Brownfield and Selessner that he could understand directions and follow instructions? I mean, in following instructions, I mean, there may be the ALJ for Mr. Brownfield's opinion, he says he gives great weight consistent with the longitudinal record, which we're arguing the record shows that he's got more severe problems, but the claimant testified to memory issues and expressing irritability went around a lot of people. Mr. Greger also expressed that he can't control his moods. So, the judge says, okay, the claimant's limitations in following only simple routine tasks and limitations in dealing with others are reflected in the residual functional capacity. Okay, well, dealing with supervisors is not reflected in the residual functional capacity. And again, I mean, that's just one example of where in the record- I understand, but you're saying he can't deal with criticism, but if the residual functional capacity is limiting him to simple routine tasks with limited interaction with coworkers and no interaction with the public, the idea that he would have to just see a supervisor at some point is consistent with that, right? Certainly the idea that he can follow instructions is consistent with some interaction with a supervisor. I mean, I take your point that extended interaction with the supervisor over maybe intense work responsibilities might lead him, you know, might implicate his limitations, but why is there not evidence there that suggests he can do simple routine tasks and interact with supervisor only insofar as necessary for the supervisor to make sure he's doing simple routine tasks? Well, I would say that, I mean, you know, this gentleman has flashbacks, and that was noted by Ms. Petrillo, and, you know, I'm going by what his treating doctors say. In January 2014, Dr. Bridges said he had markedly elevated anxiety. He had persistent distress that inhibited his ability to feel pleasure. He has persistent discomfort and anxiety. It makes him prone to act out aggressively or appear irritable. It inhibited his ability to form adaptive social relationships. There's nothing that says, you know, he'll be able to click off his brain to function properly with his supervisors. He's in, you know, the record before the consultative examiner shows he's persistently distressed, and afterwards, and this is a veteran who, you know, has multiple traumas, and his treating providers found, you know, he has complex and severe mood disorder with disability and very rigid thinking. I don't think he's going to be able to click off his rigid thinking for a supervisor, and so, in that way, it's not sufficiently explained how the judge came to the conclusions he did. Judge Ratchie or Judge Manesha? Nothing further. Thank you. Judge Manesha? No, that's fine. Thank you very much. World Reserve decision. That concludes today's regular argument calendar. I'll ask the clerk to adjourn the court. Thank you. Court is adjourned.